UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                                          :
JAMES G. PAULSEN, Regional Director of                    :
Region 29 of the National Labor Relations                 :
Board, for and on behalf of the NATIONAL                  :     **MEMORANDUM**
LABOR RELATIONS BOARD,                                    :     **<u>DECISION AND ORDER</u>**
                                                          :
                              Petitioner,                 :     16 Civ. 5338 (BMC)
                                                          :
               -against-                                  :
                                                          :
PRIMEFLIGHT AVIATION SERVICES, INC.,                      :
                                                          :
                              Respondent.                 :
--------------------------------------------------------- X

**COGAN,** District Judge.

Before the Court is a petition for a preliminary injunction under § 10(j) of the National

Labor Relations Act ("NLRA") filed by James G. Paulsen, the Regional Director of Region 29 of

the National Labor Relations Board (the "NLRB" or the "Board").  The petition seeks relief

pending the determination by an Administrative Law Judge over proceedings currently

underway, in which petitioner claims that respondent PrimeFlight Aviation Services, Inc.

("PrimeFlight") has engaged and is engaging in unfair labor practices within the meaning of

§§ 8(a)(1) and (5) of the NLRA.  <u>See</u> 29 U.S.C. § 158(a)(1), (5).  Petitioner seeks an injunction

restraining respondent from further violations of the NLRA; directing respondent to recognize

and bargain with the Service Employees International Union, Local 32BJ (the "Union" or

"SEIU"), as required under § 8(a)(5); and requiring respondent to provide information relevant to

the Union's collective bargaining efforts.

The Court ordered respondent to show cause why it should not grant the relief requested.

Having heard oral argument on the petition and reviewed the parties' submissions, the Court

concludes that petitioner has established reasonable cause for the Court to believe that PrimeFlight has committed unfair labor practices and that injunctive relief is just and proper. The petition is therefore granted in part.

## BACKGROUND

JetBlue Airways Corporation ("JetBlue") operates out of Terminal Five at John F. Kennedy Airport ("JFK") in Queens, New York.  As part of its operations, JetBlue, through independent contractors, offers baggage handling, skycap, checkpoint, and wheelchair services to its customers.  Prior to May 9, 2016, Air Serv, an independent contractor, performed the baggage handling, skycap, and checkpoint services for JetBlue, and PAX Assist, another independent contractor, performed the wheelchair services for JetBlue.  During this period, SEIU represented Air Serv employees in collective bargaining pursuant to a March 2015 recognition agreement, whereas PAX Assist employees had no union affiliation.

Respondent PrimeFlight is an independent contractor that provides terminal services at several airports around the country.  In early 2016, PrimeFlight successfully bid on a contract to provide JetBlue's terminal services at Terminal Five at JFK.  PrimeFlight entered into a contract with JetBlue, under which PrimeFlight was to provide baggage handling, skycap, checkpoint, and wheelchair services.  On May 9, 2016, PrimeFlight took over these services from both Air Serv and PAX Assist in Terminal Five and continues to provide all four types of terminal services to date.

In the weeks leading up to the May 9, 2016 transition date, PrimeFlight hired its workforce.  To hire its workforce and ensure no gap in services between Air Serv and PAX Assist ceasing operations on May 8 and PrimeFlight beginning operation on May 9, PrimeFlight asked Air Serv to provide PrimeFlight with its lists of active Air Serv employees.  PrimeFlight,

2

concerned with ensuring that it had enough qualified employees – *i.e.*, employees with the credentials required to pass through airport security – asked Air Serv to encourage its employees to apply for positions with PrimeFlight.

When PrimeFlight began operations on May 9, 2016, it had hired 362 employees in total. More than half of those employees were former Air Serv employees (189 of 362, or 52%). Further, on May 9, 2016, PrimeFlight had employees in all four job classifications – baggage handling: 76 employees; skycap: 35 employees; checkpoint: 64 employees; and wheelchair: 174 employees. By July 2016, PrimeFlight would ultimately employ 507 individuals in all four classifications – baggage handling: 81 employees; skycap: 35 employees; checkpoint: 67 employees; and wheelchair: 309 employees. Comparing the numbers of employees initially hired against the ultimate employment rolls, on May 9, 2016, PrimeFlight had hired at least fifty percent of the employees that it would ultimately employ in all four job classifications – baggage handling: 76 of 81, or 94%; skycap: 35 of 35, or 100%; checkpoint: 64 of 67, or 95%; and wheelchair: 174 of 309, or 56%. Overall, as of May 9, 2016, PrimeFlight had hired more than half of the employees that it would ultimately employ – 362 of 507, or 71%.

On May 23, 2016, SEIU sent a letter to PrimeFlight, demanding that PrimeFlight recognize SEIU as the representative of "PrimeFlight's employees at JFK Airport, the majority of whom were formerly Air Serv employees represented by Local 32BJ." The letter continued that "these are employees working at Terminal Five on the Jet Blue account" and are "providing baggage handling, skycap and check point services;" SEIU's letter stated that it understood that "the appropriate bargaining unit also includes employees providing wheelchair assistance." SEIU requested "recognition for a unit of all full-time and regular part-time employees at Terminal Five on the Jet Blue account, excluding supervisors, office clericals, and guards as

defined in the NLRA."[1]  In addition, SEIU requested certain information from PrimeFlight, including a roster of all bargaining unit employees, applicable employee handbooks, and plan descriptions for health insurance and employee benefits.

On May 25, 2016, PrimeFlight replied to SEIU, requesting evidence that established the basis for SEIU's claim that it represented the employees at issue, including Board certifications and collective bargaining agreements.  On June 2, 2016, SEIU replied to PrimeFlight, enclosing a copy of its March 2015 recognition agreement with Air Serv.  PrimeFlight replied again on June 10, 2016, seeking any additional agreements between the parties or any collective bargaining agreements for any of its employees.  On June 15, 2016, the Union replied to PrimeFlight, stating that it had already provided sufficient information and that it would provide additional material once PrimeFlight recognized the Union.  There was no further correspondence between the Union and PrimeFlight after this letter.

On May 26, 2016, three days after SEIU's May 23, 2016 request for recognition, PrimeFlight began to hire additional employees.  PrimeFlight completed all of its hiring on July 6, 2016, having hired 507 employees in total.  As a result of this hiring, former Air Serv employees comprised 39.4% of the total hired.  In its submissions to the Court, PrimeFlight stated that on taking over on May 9, 2016, it determined that it needed 500 employees and that it intended to hire more employees in two phases: one in mid-to-late June and one in July.

In July, the NLRB filed an administrative complaint under the NLRA against PrimeFlight, and the administrative hearing related to that charge is currently underway.

---

[1] The letter also described a second unit, PrimeFlight's employees at Terminal A at Newark Airport that were providing baggage handling, skycap, and checkpoint services for JetBlue, but this unit is not at issue here.

## DISCUSSION

Section 10(j) of the NLRA provides that the NLRB may petition the local district court "for appropriate temporary relief or restraining order" pending the Board's final adjudication of a charge of unfair labor practices.  29 U.S.C. § 160(j).  Correspondingly, § 10(j) provides that a district court "shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."  Id.  In the Second Circuit, a two-pronged test is used to determine whether to grant an injunction under § 10(j):  "First, the court must find reasonable cause to believe that unfair labor practices have been committed.  Second, the court must find that the requested relief is just and proper."  Hoffman ex rel. NLRB v. Inn Credible Caterers, Ltd., 247 F.3d 360, 364-65 (2d Cir. 2001).

When factual or legal disputes arise in a § 10(j) proceeding, courts within the Second Circuit are required to give substantial deference to the position of the Regional Director.  Courts have often held that § 10(j) relief should be denied only if the court is "'convinced that the NLRB's legal or factual theories are fatally flawed.'"  Mattina ex rel. NLRB v. Kingsbridge Heights Rehab. & Care Ctr., 329 F. App'x 319, 321 (2d Cir. 2009) (quoting Silverman v. Major League Baseball Player Relations Comm., Inc., 67 F.3d 1054, 1059 (2d Cir. 1995)).  With respect to issues of fact, the Regional Director should be "given the benefit of the doubt" and all factual inferences should be drawn in his favor if the inference is "within the range of rationality."  Hoffman, 247 F.3d at 365 (internal quotation marks omitted).  Disputes over issues of law are also viewed in the Regional Director's favor:  "[O]n questions of law, the Board's view should be sustained unless the court is convinced that it is wrong."  Id. (internal quotation marks omitted).

5

In the instant matter, respondent disputes the NLRA's application to the present dispute and thus both the NLRB's and this Court's jurisdiction under § 10(j); accordingly, before the Court can reach the analysis for a preliminary injunction under § 10(j), the Court must first determine whether jurisdiction is proper under the NLRA.

I.     **The NLRB Has Jurisdiction over PrimeFlight's Employees at Terminal Five at JFK.**

The NLRA's protections extend to workers who qualify as "employee[s]" under § 2(3) of the Act.  29 U.S.C. § 152(3).  However, the term "employee," as defined in the NLRA, does not include "any individual employed by an employer subject to the Railway Labor Act."  Instead, the Railway Labor Act ("RLA") gives the National Mediation Board ("NMB") jurisdiction over a company and its employees when either that company is a common carrier by air or rail as defined in the RLA, or that company is directly or indirectly owned or controlled by a rail or air carrier engaged in interstate or foreign commerce, referred to as a "derivative carrier" in RLA and NMB parlance.  45 U.S.C. §§ 151, *et seq.*; see, e.g., Airway Cleaners, LLC, 41 NMB 262, 267 (2014).  When the company is not directly a carrier, the NMB applies a two-part jurisdictional test to determine whether the company is subject to the RLA as a "derivative carrier."  The test asks (1) whether the functions performed by the potential derivative carrier's employees are among those traditionally performed by carrier employees, and (2) whether the potential derivative carrier's labor relations are subject to significant control by the carrier. Cunningham v. Electronic Data Sys., Inc., 579 F. Supp. 2d 538, 541 (S.D.N.Y. 2008); Union of Indus. v. Nat'l Mediation Bd., 139 F. Supp. 2d 557, 561 (S.D.N.Y. 2001).

The NLRB has jurisdiction over the instant dispute for several reasons.  First, the NLRB's decision to assert jurisdiction over this case is subject to deference.  In so concluding, the Court confronts respondent's position at oral argument that the NLRB is not entitled to Chevron deference on matters related to its jurisdiction.  This position is wrong.  In City of

6

Arlington, Tex. v. F.C.C., 133 S. Ct. 1863 (2013), the Supreme Court unequivocally rejected an argument that sought to delineate some fictional boundary between deference to jurisdictional questions and deference to nonjurisdictional questions:  "[Q]uestions about the scope of agencies' regulatory jurisdiction . . . are all questions to which the Chevron framework applies." 133 S. Ct. at 1870; see also id. at 1868 ("[T]he distinction between 'jurisdictional' and 'nonjurisdictional' interpretations is a mirage.  No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority.").  The Supreme Court has even rejected this attempt to bifurcate questions of deference in cases involving the NLRB.  NLRB v. City Disposal Sys. Inc., 465 U.S. 822, 830, 104 S. Ct. 1505, 1510 (1984) ("[W]e have not hesitated to defer to the Board's interpretation of the Act in the context of issues substantially similar to that presented here," *i.e.*, "a jurisdictional or legal question concerning the coverage of the [NLRA].").  Here, the NLRB has asserted jurisdiction on the basis that the PrimeFlight employees are not excluded from the NLRA's coverage by operation of the RLA.  This determination is supported by both NLRB and NMB precedents, to which the Court also affords deference given that they each reach questions of the agency's jurisdictional coverage.  Accordingly, the Court gives deference to the NLRB's position asserting jurisdiction in the instant matter.

Second, it is significant, and subject to deference, that the NMB has, in response to referrals from the NLRB, declined jurisdiction over cases presenting similar factual situations involving airline contractors that provide similar ancillary services.  For example, in Menzies Aviation, Inc., 42 NMB 1 (2014), the NLRB referred to the NMB the question of whether Menzies Aviation, Inc., an independent contractor that provides ramp, baggage, and airport

7

servicing functions to Alaska Airlines, British Airways, and Virgin America, was subject to the

RLA.  The NMB declined RLA jurisdiction over Menzies, instead finding that although Menzies

performed the kind of work typically done by air carriers, the air carriers did not directly or

indirectly control Menzies.  42 NMB at 7.  See also Airway Cleaners, LLC, 41 NMB 262, 267-

69 (2014) (NMB declining jurisdiction over contractor providing cleaning and maintenance to

airlines); Bags, Inc., 40 NMB 165, 169 (2013) (NMB declining jurisdiction over contractor

providing skycap, wheelchair, and unaccompanied minor services to airlines).

It appears to the Court, as it appeared to the NLRB, that the NMB has, since 2013, ceded

jurisdiction over certain airline contractors to the NLRB.  See PrimeFlight Aviation Servs., Inc.,

Case 12-RC-113687, 2015 WL 3814049, *1 n.1 (NLRB June 18, 2015) ("[T]hese cases

represent a shift by the NMB from earlier opinions in which it had asserted jurisdiction on

similar grounds, and that this view is currently extant NMB law.").  The NLRB need not

continue seeking advisory guidance from the NMB over airline contractors when the NMB has

expressed a clear position that it does not have jurisdiction over certain categories of contractors

employed by air carriers.  Further, it is reasonable that the NLRB "will not refer a case [to the

NMB] that presents a jurisdictional claim in a factual situation similar to one in which the NMB

has previously declined jurisdiction."  Spartan Aviation Indus., Inc., 337 NLRB 708 (2002).  It is

additionally reasonable that the NLRB now affirmatively asserts jurisdiction in these cases,

absent evidence that an airline exercises greater control over the contractor than is present in "a

typical subcontractor relationship."  Allied Aviation Serv. Co., 362 NLRB No. 173, 2015 WL

4984885, *2 (Aug. 19, 2015).

Second, even if the Court were to apply the NMB's two-part test to the present facts, it

would nonetheless determine that PrimeFlight is not a derivative carrier and that the NLRB has

jurisdiction.  As stated above, the NMB's test asks two questions that both must be answered affirmatively: (1) are the PrimeFlight employees' functions traditionally performed by carrier employees (the "functions factor"); and (2) does JetBlue exercise substantial control over PrimeFlight (the "substantial control factor")?  Here, while the answer to the first question is certainly yes, the answer to the second question is resoundingly no.

The Court declines to adopt PrimeFlight's focus on the functions factor to the detriment of the substantial control factor.  Although the Court recognizes PrimeFlight's argument that a work stoppage by its employees would halt JetBlue's services, that fact is true of all of the cases in which the NMB declined jurisdiction.  In Menzies, Bags, and Airway Cleaners, the NMB found that the services were all typically performed by an air carrier, but it was the substantial control factor that required the NMB to decline jurisdiction.

The substantial control factor turns on whether the airline carrier controls, directly or indirectly, the employer and its employees.  Factors routinely considered in this analysis are (i) the control over the manner in which the entity conducts its business, including access to the employer's operations and records; (ii) involvement in hiring, firing, and disciplinary decisions; (iii) supervision and direction of the entity's employees in the performance of their job duties; (iv) influence over the conditions of employment; (v) influence over employee training; and (vi) control over uniform and appearance requirements.  See, e.g., Auto. Distr. of Buffalo Inc. & Complete Auto Network, 37 NMB 372, 378 (2010).  Not all of the factors must be present to meet the substantial control test, and importantly, it is not a matter of simply asking whether there is influence or involvement – the question turns on the materiality of that influence and involvement.

9

PrimeFlight unpersuasively argues that, pursuant to their agreement with JetBlue, JetBlue exercises substantial control over nearly every aspect of its JFK operations because all indicia of control are present.  However, as stated above, the mere presence of these factors is insufficient, and the overwhelming factual similarities between the instant case and Bags, Inc., where the NMB declined jurisdiction, is instructive in finding the factors insufficiently met.

First, PrimeFlight argues that its employees use JetBlue space in Terminal Five; yet in Bags, the company either leased space or was given space by the airlines it served, and the NMB found this factor materially insufficient.  Bags, Inc., 40 NMB at 167.  Next, PrimeFlight argues that it builds its employees' work schedules and hours based on the flight schedule JetBlue provides, but similarly, the air carriers' schedules dictated the staffing levels and shift assignments of Bags employees, and the NMB found that insufficient to confer jurisdiction.  Id. at 168.  Next, PrimeFlight argues that JetBlue tracks the work PrimeFlight performs on a real-time basis to ensure appropriate staffing levels; however, similarly, Bags and Delta had daily conference calls to discuss staffing, and this was insufficient for NMB jurisdiction.  Id. at 167.  PrimeFlight also argues that JetBlue's Statement of Work imposes rules of conduct to which PrimeFlight employees must adhere, but in Bags, there were also agreements with the carriers that dictated certain standards, including professionalism, competence, and language skills.  Id. at 166.  Next, PrimeFlight argues that JetBlue has the right to inspect and audit PrimeFlight's books, records, and manuals at all times, as well as to request training records, accident and injury reports, employee grievances, and disciplinary actions; however, similarly and seemingly more controlling, Bags submitted weekly reports to the airline on all issues and accounting, and the carriers had full access to review employee and training records.  Id. at 167, 168.

With respect to hiring, discipline, and termination, PrimeFlight argues that JetBlue has the right to demand the removal of an employee from the workplace, and if JetBlue exercises that right, PrimeFlight must terminate that employee.  However, PrimeFlight provided the Court with its agreement with JetBlue, and nowhere is there a provision providing JetBlue with such a unilateral right of removal.  Petitioner pointed to one provision during oral argument that calls for removal in a very narrow circumstance:  if a skycaps employee is found to be collecting revenue outside of the system, JetBlue will request that employee be removed from baggage checking services.  However, there is no indication in the agreement that the employee must be terminated; rather, it appears that PrimeFlight can simply transfer the employee to checkpoint or wheelchair services, as the agreement only calls for removal from baggage checking.

The Court found another provision that calls for PrimeFlight to discipline employees, up to and including termination, if the employee causes work stoppages or interferes with JetBlue's ability to provide its services, but even there, the Court notes that the ultimate disciplinary decision is left in the hands of PrimeFlight.  With respect to hiring, PrimeFlight has control over personnel decisions: it set up its own hiring process, interviewed employees, and made employment offers without input from JetBlue.  Further, PrimeFlight set the rate of pay, benefits, disciplinary procedures, and attendance requirements, among other policies.

Next, PrimeFlight argues that JetBlue supervisors interact with PrimeFlight employees every day and have the authority to direct work; however, similarly, Bags had daily conference calls with Delta managers to discuss wheelchair complaints and any other daily issues, including inadequate staffing, and Bags was to use "best efforts to follow any instructions provided by Delta's designated management representatives . . . regarding the standards, procedures, and practices to be followed."  Id. at 167.

PrimeFlight argues that JetBlue provides PrimeFlight employees with radios, wheelchairs, computers, baggage carts, and the technology platforms used by PrimeFlight to provide services, in addition to the locker rooms and breakrooms; yet, in <u>Bags</u>, although Bags owned the baggage carts, wheelchair dispatch handhelds, and the computers for Alaska skycap, Delta provided its curbside skycap computers, bag tag printers, curb podiums, some of the wheelchairs, and the breakroom, and Alaska Airlines provided the curbside check-in podium, curbside space, bag belt, wheelchairs, electric carts for terminals, and breakroom.  <u>Id.</u> at 167. There is no significant difference between providing a substantial amount of equipment and all of the equipment such that the jurisdictional question would come out differently.

Next, PrimeFlight argues that it trains its employees initially and recurrently, and that the training includes certain JetBlue curriculum, like policies and initial training.  PrimeFlight further provides that its employees are to attend JetBlue meetings relating to safety, new programs, special events, and coordination.  But this is also similar to <u>Bags</u>:  Bags provided disability and customer service training for all employees, with the air carriers training one Bags employee to train the other Bags employees on certain check-in procedures.  Further, in <u>Bags</u>, the air carriers provided all additional training that was required by the FAA.  <u>Id.</u> at 166-67.

Finally, PrimeFlight argues that it had to receive approval from JetBlue's branding department regarding PrimeFlight's uniform, and that if PrimeFlight seeks to change the uniform, it needs to get approval from JetBlue.  However, in <u>Bags</u>, the airlines and Bags stipulated personal appearance standards and the airlines had to approve the uniforms, as well. <u>Id.</u> at 167, 169.  Furthermore, in both cases, PrimeFlight and Bags employees were not held out as carrier employees; their uniforms clearly identified them as PrimeFlight and Bags, respectively.

In each of the factual situations in <u>Bags</u>, the NMB found that the presence of the factors was "insufficient to establish jurisdictional control without additional evidence of <u>material control by a carrier.</u>" <u>Id.</u> at 170 (emphasis added).  It is this material control that the Court finds lacking here, as well.  PrimeFlight may claim that JetBlue has provided work specifications, but these specifications are not sufficient to create RLA jurisdiction.  <u>Airway Cleaners</u>, 41 NMB at 268; <u>Bags, Inc.</u>, 40 NMB 165, 166-67 (2013).  Accordingly, the Court finds that the NLRA properly controls.

## II.    The NLRB Is Entitled to a Preliminary Injunction Against PrimeFlight.

Having found that the NLRA controls, the Court can now determine whether a preliminary injunction is warranted.  As stated above, in this Circuit, a two-pronged test is used to determine whether to grant an injunction under § 10(j):  "First, the court must find reasonable cause to believe that unfair labor practices have been committed.  Second, the court must find that the requested relief is just and proper."  <u>Hoffman</u>, 247 F.3d at 364-65.

### A.  There Is Reasonable Cause to Believe that PrimeFlight Has Committed Unfair Labor Practices.

The Second Circuit has stressed that a district court may find "reasonable cause" under the first prong of the § 10(j) standard without making a final determination whether the conduct in question constitutes an unfair labor practice.  <u>Silverman</u>, 67 F.3d at 1059.  In fact, the threshold for finding "reasonable cause" has been analogized to the threshold for making out a *prima facie* case, and courts have held that the Regional Director need only "come forward with evidence 'sufficient to spell out a likelihood of violation.'"  <u>Blyer v. Pratt Towers, Inc.</u>, 124 F. Supp. 2d 136, 143 (E.D.N.Y. 2000) (quoting <u>Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union</u>, 494 F.2d 1230, 1243 (2d Cir. 1974)).

In the instant case, the issue of whether there is reasonable cause to believe that an unfair labor practice occurred hinges on determining whether PrimeFlight is a <u>Burns</u> successor and was therefore obligated to recognize and bargain with the Union in good faith as of the date of the demand letter.  For the reasons set forth below, the Court finds it likely that PrimeFlight was a <u>Burns</u> successor on May 23, 2016, and that its conduct amounted to unfair labor practices.

The Supreme Court held in <u>NLRB v. Burns International Security Services, Inc.</u>, 406 U.S. 272, 92 S. Ct. 1571 (1972), that if a new employer "voluntarily [takes] over a bargaining unit" of its predecessor, then the successor employer is under a duty to bargain with the union that represented the predecessor's employees.  <u>Burns</u>, 406 U.S. at 287, 92 S. Ct. at 1582.[2]  Under <u>Burns</u>, the obligation to recognize and bargain with an incumbent union exists when there is (i) "substantial continuity" between the predecessor and successor enterprises, and (ii) when a majority of the employees of the successor, in an appropriate unit, had been formerly employed by the predecessor.  <u>Burns</u>, 406 U.S. at 280-81, 92 S. Ct. at 1578-79.  In a later case, the Court further explained that determining whether a new company is a successor "is primarily factual in nature and is based upon the totality of the circumstances of a given situation."  <u>Fall River Dyeing & Finishing Corp. v. NLRB</u>, 482 U.S. 27, 43, 107 S. Ct. 2225, 2236 (1987).

The Supreme Court has made it clear that <u>Burns</u> successorship is based on an employer's voluntary choice to hire more than fifty percent of its workforce from its predecessor's workforce.  <u>See</u> <u>Fall River</u>, 482 U.S. at 41, 107 S. Ct. at 2234-35 (explaining that the

---

[2] The Court inquired particularly on the topic of PrimeFlight's decision to "voluntarily [take] over [the] bargaining unit" of Air Serv during oral arguments.  PrimeFlight claimed that it did not have any knowledge that Air Serv employees were unionized when it made its bid.  Accepting PrimeFlight's argument that the bid process did not require the same kind of due diligence as a merger, the Court still has a hard time understanding how PrimeFlight failed to make at least a first-level inquiry as to the employees' bargaining status – maybe not at the bid stage because it was not clear then that PrimeFlight intended to hire Air Serv employees, but certainly in April when PrimeFlight communicated with Air Serv about encouraging its employees to apply to PrimeFlight.  Surely then, PrimeFlight could have asked whether Air Serv employees were unionized.  Moreover, if PrimeFlight failed to ask that question, then it is even harder to say that PrimeFlight, as a successor, did not "voluntarily [take] over" a unionized workforce when it paid no attention to whether the employees it was hiring were unionized.

14

successorship doctrine is based on the "conscious decision" of the new employer "to maintain generally the same business and to hire a majority of its employees from the predecessor" and that "[t]his makes sense when one considers that the employer intends to take advantage of the trained work force of its predecessor").  PrimeFlight is likely a <u>Burns</u> successor because the record indicates that (i) PrimeFlight substantially continued Air Serv's operations in Terminal Five, and (ii) as of May 23, 2016, a majority of the employees that PrimeFlight hired were former employees of Air Serv.

**(i) Substantial Continuity**

The evidence tends to show that there is substantial continuity between Air Serv and PrimeFlight.  The "substantial continuity" inquiry involves assessing several factors:

> whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

<u>Fall River</u>, 482 U.S. at 43, 107 S. Ct. at 2236.  The test focuses on the retained employees' perspective as to whether their jobs are essentially unaltered.  <u>Id</u>.  PrimeFlight continued to operate Air Serv's operations in baggage handling, skycap, and checkpoint services in basically unchanged form.  The transition between the two enterprises was overnight, with Air Serv concluding its operations on May 8 and PrimeFlight beginning its operations without interruption on May 9.  Further, on May 9, the PrimeFlight employees in baggage handling, skycap, and checkpoint services were over 90% the same as those previously employed in those classifications at Air Serv.

Petitioner provided affidavits indicating that, from the employees' perspectives, there was no material difference between their last day at Air Serv and their first day at PrimeFlight, May 8 and May 9, respectively.  Baggage handler Denzyl Prince worked on both Air Serv's last day and

PrimeFlight's first day, and he stated that there was no interruption in services between the two

companies.  Similarly, checkpoint services employee Allison Halley stated that her job remained

substantially the same after PrimeFlight took over:  She kept the same supervisor, the same shift,

and the same duties.  Halley further stated that the only difference for her was appearance:  She

wears a different uniform, her identification says "PrimeFlight" instead of "Air Serv," and she

uses a different kind of time clock to log her hours.

PrimeFlight's changes, such as rebranding uniforms and IDs, are minor, considering that

the employees are doing the same work they were doing for Air Serv, in the same location, with

substantially the same supervision, and with no interruption in service.  Although PrimeFlight

added another classification, wheelchair assistance, from PAX Assist, that does not alter the

analysis:  the focus is on the unionized employees' perceptions of their jobs. See, e.g., NLRB v.

DeBartelo, 241 F.3d 207, 210-11 (2d Cir. 2001) (holding that substantial continuity "is evaluated

principally from the employees' perspective, the crucial question being whether those employees

who have been retained will understandably view their job situations as essentially unaltered"

(internal quotation marks omitted)).

**(ii) Majority Status**

Once the substantial continuity test is satisfied, a successor's bargaining obligation

requires that a majority of the employees of the successor, in an appropriate unit, were formerly

employed by the predecessor.  Here, the record shows that as of May 23, 2016, when SEIU made

its demand for recognition, 52% of PrimeFlight's employees (189 of 362) had been previously

employed by Air Serv and represented by SEIU.

PrimeFlight's response is that on May 23, it had not yet finished hiring, making the

NLRB's and the Union's analysis of the composition of its workforce premature.  Relying on

Fall River, PrimeFlight argues that its bargaining obligation is triggered only if a "substantial and

representative complement" existed at that time.  <u>Fall River</u>, 482 U.S. at 47, 107 S. Ct. at 2238.

However, the facts underlying the decision in <u>Fall River</u> do not help PrimeFlight.  As an initial

matter, the Court notes that <u>Fall River</u> dealt with an entirely different situation; there, the

Supreme Court confronted a seven-month gap between the end of the predecessor's business and

the commencement of the successor's business.  In setting the issue for resolution, the Court

determined that in <u>Burns</u>, the Court "did not have to consider the question when the successor's

obligation to bargain arose: [the predecessor's] contract expired on June 30 and [the successor]

began its services with a majority of former [predecessor] guards on July 1."  <u>Id.</u> at 47, 107 S. Ct.

at 2238.  That is the situation we have here, which suggests, in line with <u>Burns</u>, that the

obligation to bargain arose on May 9, 2016, but was officially triggered when SEIU requested

recognition on May 23.

      Even if this Court were to apply the "substantial and representative complement" test

found in <u>Fall River</u>, the analysis would still favor the NLRB.  Where "there is a start-up period

by the new employer while it gradually builds its operations and hires employees," the NLRB

and courts have "adopted the 'substantial and representative complement' rule for fixing the

moment when the determination as to the composition of the successor's work force is to be

made."  <u>Id.</u> at 47, 107 S. Ct. at 2238.  When fixing that moment, the NLRB examines the

following factors: whether the employer has substantially filled the unit job classifications

designated for the operation, whether the operation was in substantially normal production, the

size of the complement on the date of normal production, the time expected to elapse before a

substantially larger complement would be at work, and the relative certainty of the expected

expansion.  <u>Id.</u> at 49, 107 S. Ct. at 2239.

17

The rule's application turns on the facts of the case.  In <u>Fall River</u>, the Court found Fall River to be a <u>Burns</u> successor because the successor "had hired employees in virtually all job classifications, had hired at least fifty percent of those it would ultimately employ in the majority of those classifications, and it employed a majority of the employees it would eventually employ when it reached full complement."  <u>Id.</u> at 52, 107 S. Ct. at 2240.  Here, on the demand date, PrimeFlight hired people into all four job classifications; it had hired at least 50% in a majority of the classifications, in fact hiring over 90% of the employees in three out of the four job classifications and 56% in the fourth classification; and it employed a majority of the employees it would eventually employ when it reached full complement, 71%, or 362 out of 507 employees.

PrimeFlight's argument that it had not come close to realizing its business goal of increasing its employee complement to at least 500 workers is not persuasive given the lack of support in the record and the standard that this Court draw all factual inferences in favor of the NLRB.  PrimeFlight provided an affidavit from its Division Vice President Matthew Barry, stating that on beginning operations, PrimeFlight made the decision to increase hiring to 500. The NLRB disputes this point, arguing that PrimeFlight began to hire in earnest a short three days after receiving the demand letter to avoid its bargaining obligation.  The NLRB further presents that as part of the administrative investigation, PrimeFlight produced documentary evidence originating prior to the demand letter and showing discussions about hiring as many as 50 employees in addition to the 362 employees it had already hired.  Even if there was no dispute and the Court were to accept PrimeFlight's argument that it intended to hire more workers, this still would only trigger the "substantial and representative complement" analysis, and that analysis still favors the NLRB.

PrimeFlight next argues that July 6, 2016, is the appropriate date to assess collective bargaining obligations because that is when PrimeFlight met its staffing goals.  This argument is inherently flawed.  PrimeFlight is essentially asking this Court to supplant the "substantial and representative complement" rule with a *per se* "full complement" rule.  The Court declines this invitation.

Once majority status is found, a successor's bargaining obligation requires that the unit remain appropriate for collective bargaining under the successor's operations.  The NLRB has long held that a single-facility unit is presumptively appropriate and that the party opposing it has a heavy burden to rebut its presumptive appropriateness.  See, e.g., NLRB v. HeartShare Human Servs. of N.Y., Inc., 108 F.3d 467, 471 (2d Cir. 1997).  Here, the unit is presumptively appropriate because it is a single-facility, wall-to-wall unit of PrimeFlight's employees at Terminal Five at JFK.  Although the unit includes the wheelchair assistants, who were unrepresented at the time that PrimeFlight took over operations, this does not destroy PrimeFlight's bargaining obligation.  In analyzing a successor's duty to bargain, the NLRB has found units that include previously unrepresented employees to be appropriate, as long as a majority of the unit is comprised of predecessor employees.  Good N' Fresh Foods, 287 NLRB 1231, 1236-37 (1988) (finding that successor was obligated to bargain with union as unit comprised of formerly unrepresented maintenance employees and represented production employees); see also NLRB v. Hudson River Aggregates, Inc., 639 F.2d 865, 871 (2d Cir. 1981) (holding that the NLRB's bargaining unit determinations are rarely to be disturbed unless arbitrary, unreasonable, or not supported by substantial evidence.).[3]

---

[3] Courts reviewing the NLRB's determinations regarding appropriate units base their analysis on "whether the . . . employees have a sufficient community of interest to be an appropriate unit."  Trustees of Masonic Hall & Asylum Fund v. NLRB, 699 F.2d 626, 632 (2d Cir. 1983).  A substantial community of interest may be found for units of varying scope, and the NLRB enjoys discretion to select from those possible arrangements in reaching its

A successor employer who satisfies the <u>Burns</u> test but fails to meet its bargaining obligation violates § 8(a)(5) of the Act.  <u>Burns</u>, 406 U.S. at 281, 92 S. Ct. at 1579.  Those successors who refuse to bargain under their § 8(a)(5) obligation are in violation of both §§ 8(a)(5) and 8(a)(1) of the NLRA.  For the foregoing reasons, the Court has reasonable cause to find that PrimeFlight was likely a successor business to Air Serv; that, on the date of the Union's demand letter, previously represented parties were the majority of employees; that the majority was a substantial and representative complement of the full staff reached on July 6, 2016; that PrimeFlight had a duty to bargain with the union; and that its failure to do so likely constituted a violation of the NLRA.

### B.  Granting Injunctive Relief Against PrimeFlight Would Be Just and Proper.

An injunction is deemed to be "just and proper" when it is "'necessary to prevent irreparable harm or to preserve the status quo.'"  <u>Mattina</u>, 329 F. App'x at 321 (quoting <u>Hoffman</u>, 247 F.3d at 368).  Although this standard is meant to "preserve[] traditional equitable principles governing injunctive relief," a court should be mindful to apply this standard "in the context of federal labor laws."  <u>Hoffman</u>, 247 F.3d at 368.  This means that "irreparable harm" should be interpreted with regard to "the policies of the [NLRA]," and actions which undermine these policies can constitute irreparable harm.  <u>Id.</u> (quoting <u>Seeler v. Trading Port, Inc.</u>, 517 F.2d 33, 40 (2d Cir. 1975)).

In applying these principles, the Second Circuit has concluded that § 10(j) relief is warranted where serious and pervasive unfair labor practices threaten to render the Board's processes "totally ineffective" by precluding a meaningful final remedy, or where interim relief

---

unit determination. <u>Am. Hosp. Ass'n v. NLRB</u>, 499 U.S. 606, 610, 111 S. Ct. 1539, 1542 (1991).  Neither party raises this analysis; however, based on the community-of-interest factors, the evidence submitted, and petitioner's statements at oral argument that employees were shifted through job classifications, there is reasonable cause to find the unit appropriate, and there is no reason to disturb the NLRB's determination. <u>See, e.g.</u>, <u>Staten Island Univ. Hosp. v. NLRB</u>, 24 F.3d 450, 454 (2d Cir. 1994).

is the only effective means to preserve or restore the status quo as it existed before the onset of the violations; or where the passage of time might otherwise allow the respondent to accomplish its unlawful objective before being placed under any legal restraint.  Kaynard v. Mego Corp., 633 F.2d 1026, 1033-34 (2d Cir. 1980).

Based on the affidavits and briefing provided by the parties, a preliminary injunction is just and proper.  There is evidence that there has been a chilling effect on speaking to Union representatives, attending meetings, and voicing support in any meaningful way.  PrimeFlight's employees have given sworn affidavits showing that support for SEIU has declined since PrimeFlight began operations.

Because the Court has found reasonable cause to believe that an unfair labor practice occurred and that granting the injunctive relief would be just and proper, the Court will grant the preliminary injunction in part.  However, the Court has modified the terms of the preliminary injunction that petitioner has requested so as to prevent respondent from suffering certain unnecessary costs or obligations pending the final determination of the Administrative Law Judge.

**D.  Terms of the Injunction**

For the reasons stated above, a preliminary injunction shall issue.  The proposed preliminary injunction language that petitioner submitted to the Court is too broad as it would essentially award petitioner complete and permanent relief to which petitioner is not entitled. The Administrative Law Judge is conducting proceedings and will make his findings of fact and determinations for permanent relief.  To ensure that the relief awarded is temporary and contingent on the outcome of the administrative proceeding and to protect PrimeFlight from unduly burdensome obligations and costs, the terms of the injunction will be as follows.  First,

21

PrimeFlight must recognize the Union as the interim collective bargaining representative of PrimeFlight's full-time and part-time JFK employees, excluding confidential employees, office clericals, guards, and supervisors, as defined by the NLRA.

Next, PrimeFlight must engage in good faith collective bargaining with the Union; however, the bargaining is subject to the following limitations: (i) any agreement reached between PrimeFlight and the Union may not include any provisions regarding a minimum number of shifts per employee or minimum staffing levels per shift – PrimeFlight will determine the shifts and staffing levels when JetBlue provides notice of its staffing and shift needs, and PrimeFlight will not be forced to needlessly staff and pay employees when there is no need to staff them; and (ii) any agreement reached between PrimeFlight and the Union is subject to termination if the Administrative Law Judge determines that PrimeFlight is not subject to the NLRA or did not violate any provisions in the NLRA.  These restrictions will enable the parties to bargain in good faith to facilitate the Union being able to represent PrimeFlight employees in negotiations without sacrificing PrimeFlight's flexibility to assign appropriate coverage to meet JetBlue's service needs.

Finally, PrimeFlight will also provide SEIU with the information requested in its May 23, 2016 letter, including a roster of all bargaining unit employees, applicable employee handbooks, and information pertaining to health insurance and employee benefit plans.

**CONCLUSION**

The petition for a preliminary injunction is granted in part. The terms of the preliminary injunction as set forth above will be issued separately.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
October 24, 2016

23